**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAVIEN ANTHONY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24 C 50166** |
| | ) | |
| **UAW LOCAL 1268, and STELLANTIS,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Pro se Plaintiff Javien Anthony ("Anthony") claims that his former employer, Defendant Stellantis N.V. ("Stellantis"), violated his rights under the Americans with Disabilities Act ("ADA") by laying him off on October 8, 2019. Anthony alleges that he was laid off due to his visual impairment (for which Stellantis denied reasonable accommodations), and in retaliation for Anthony's having filed complaints of bullying by colleagues on account of his disability. Anthony contends his union, Defendant United Auto Workers Local 1268 ("the Union"), also violated the ADA by failing to ensure that Stellantis complied with the law and allegedly participating in Stellantis's discriminatory actions, either through active collusion or tacit support.

About a year after Anthony was laid off, the Union filed a grievance with Stellantis on Anthony's behalf. Eventually, the Union secured Anthony's reinstatement through a settlement of the grievance, though by that time Anthony had been out of the job for about three and a half years. Anthony claims the Union breached its duty of fair representation to him by delaying the filing of the grievance and by failing to secure back pay as part of the settlement.

The Union has moved to dismiss Anthony's claims, arguing both that the ADA claim is time-barred, and that Anthony has failed to state a claim on both theories otherwise [7]. That motion is now fully briefed. For the reasons explained below, the motion is granted, but Anthony's claims are dismissed without prejudice.

## **BACKGROUND**

In considering the Union's motion to dismiss, the court accepts the well-pleaded facts in Anthony's complaint as true and draws reasonable inferences in his favor. *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). In his form complaint, Anthony has described only the basic features of his claim (*see* Compl. [1] at 1–6); the details set forth here are taken almost entirely from charges that Anthony filed against Defendants with the Equal Employment Opportunity Commission ("EEOC") in September 2023. (*See id.* at 8–13.)

Anthony was diagnosed with Cone Dystrophy in 2010. (*Id.* at 8.) This degenerative, ocular disorder substantially limits Anthony's vision. (*Id.*) In 2014, despite having failed the visual portion of a required physical examination, Anthony was hired by auto manufacturer Fiat Chrysler Automobiles N.V. ("FCA") (now Stellantis)[1] as a line worker at its assembly plant in Belvidere, Illinois. (*Id.* at 1, 8.) Anthony worked there beginning in 2014 without any restrictions and without any problem in performing his essential job functions. (*Id.* at 8.) Anthony alleges, however, that he began suffering bullying and harassment at work on account of his disability in 2017 or 2018 (*id.*); for example, Anthony avers that a "team leader" named Theresa made insulting comments about him to other workers, including that Anthony "[rode] the short bus." (*Id.* at 9.) Anthony complained about this treatment at FCA but, to his knowledge, no action was taken in response. (*See id.* at 8–9.)

In February 2019, Anthony took the FCA physical examination again and again failed the vision portion.[2] (*Id.* at 9.) This time, FCA restricted Anthony from work requiring "far vision," but

[1] FCA merged with fellow auto manufacturer Peugeot in 2021 to form Stellantis. *See* Press Release, STELLANTIS, *The Merger of FCA and Groupe PSA Has Been Completed* (Jan. 16, 2021), https://www.stellantis.com/content/dam/stellantis-corporate/archives/fca/press-releases/2021/january/The_merger_of_FCA_and_Groupe_PSA_has_been_completed.pdf.

[2] Anthony took the examination again because he had been laid off in October 2018, allegedly for being absent from work. (Compl. at 9.) Anthony challenged this decision on the ground that his absence was the result of injuries he sustained in a car accident and was reinstated the following year. (*Id.*) Anthony's complaint does not say whether the Union played any role in fighting this layoff or obtaining the reinstatement.

this restriction did not preclude his continued employment as a line worker. (*Id.*) In fact, Anthony did not become aware of the restriction until June 2019, when he learned that FCA had begun laying off employees whose personnel files noted restrictions. (*Id.*) On June 10, Anthony received a notification from FCA that he had been laid off on account of there being "No Work Available." (*Id.*) He was almost immediately reinstated, however, because, in Anthony's account, the human resources department at FCA had not approved of the dismissal. (*Id.*) Anthony also alleges that at around this time, one or more unnamed employees of FCA pressured him to "go on disability," but he refused. (*Id.*)

Upon his return to work just two days after the layoff notice, Anthony received training and certification to work at several new workstations. (*Id.*) At some point in July 2019, FCA removed Anthony from his ordinary work assignment and made him a "floater" (*id.*)—a position that the court infers involved Anthony's rotating from one workstation at the assembly plant to another as needed.

On September 9, 2019, Anthony hurt his dominant right hand at work; he would later learn that he had also torn his rotator cuff. (*Id.*) On September 10, when Anthony sought to discuss this issue with on-site Union steward Bill Denton, Denton tried to persuade Anthony that he did not really need to seek medical attention. (*Id.* at 10.) According to Anthony, Denton remarked, "you people are always complaining and running to medical for any little thing." (*Id.*) Eventually, Anthony was allowed to visit the medical department at FCA where he was provided ice for swelling. (*Id.*) Anthony later sought medical care on his own on September 12, 2019. (*Id.*)

FCA adjusted Anthony's work to some degree in response, assigning him to light duty that included limits on "lifting and crimping."[3] (*Id.* at 9.) But FCA continued to assign Anthony work

---

[3] Anthony does not offer details about what "lifting" meant in the context of his job or explain what he means by "crimping." Presumably, some part of Anthony's job involved simply lifting and/or carrying materials or parts used on the assembly line. In the manufacturing context, the court understands "crimping" to refer to "a method of joining two metals together that is often accomplished with a hand-held tool." *Swaging & Crimping: What's the Difference?*, FENN (Aug.

that required pinching or gripping with his right hand, disregarding the recommendation of Anthony's doctor.[4] (*Id.*) Further, a doctor employed by FCA began rejecting the restrictions proposed by Anthony's doctor more broadly: the FCA doctor raised the limit on lifting for Anthony from five pounds to ten pounds and permitted Anthony to be assigned to tasks that required crimping. (*Id.* at 10.) At some point in September 2019, Anthony raised objections to these work conditions with the Union, but the Union did not file a grievance in response or otherwise act on this information. (*Id.*) Anthony raised the issue again with Union official Tony Cavallaro on October 1, 2019, but despite assurances that he would look into these issues and report back, Cavallaro did not again communicate with Anthony regarding these work conditions. (*Id.*)

When Anthony arrived at work on October 8, 2019, his supervisor told him there was "no work available" that was consistent with Anthony's restrictions, and FCA placed Anthony on "PQX disability" leave. (*Id.*) Anthony does not explain what is meant by "PQX disability leave," but he refers to this event as a "layoff" and alleges that the Union "signed off on" the layoff. (*See id.* at 10, 13.) Evidently in response to the layoff, on October 22, 2019, Anthony submitted a statement from his optometrist, Jon Russell, that Anthony could return to work with certain restrictions (more lighting, no night driving, and extra time for some jobs). (*Id.* at 10.) FCA did not return Anthony to work, however, and although Anthony requested that the Union file a grievance challenging his layoff, the Union failed to do so. (*Id.*)

---

5, 2020), https://www.fenn-torin.com/blog/swaging-crimping-whats-the-difference; *see also* John Sprovieri, *Assembly Presses: Crimping, Staking, Swaging, Clinching*, ASSEMBLY MAGAZINE (Aug. 30, 2010), https://www.assemblymag.com/articles/87755-assembly-presses-crimping-staking-swaging-clinching ("Crimping involves pinching or compressing material around another part. This technique is used to attach terminals to battery cables and fittings to automotive hoses. Crimping is used to assemble solenoids, door locks, sprinkler heads and catheters.")

[4] It is not clear from the record whether Anthony's doctor communicated the proposed restrictions directly to FCA via a note or phone call, or whether Anthony himself simply relayed what his doctor had told him.

Anthony eventually filed charges with the EEOC against both FCA and the Union.[5] On September 21, 2020, Anthony's then-attorney submitted a letter to FCA and the Union requesting that Anthony be returned to work, but this request was denied (Anthony does not say when, or by whom). (*Id.* at 11.) On October 1, 2020, the Union filed a grievance with FCA seeking Anthony's reinstatement, invoking a section of the collective bargaining agreement between FCA and the Union (not quoted in the complaint) that permits an otherwise-qualified employee to work with a waiver of medical restrictions. (*Id.*) FCA did not consent to this waiver (*id.*), but Anthony does not appear to allege that FCA ran afoul of the collective bargaining agreement in this regard.

In March 2021, Anthony delivered to FCA another note from his optometrist, Dr. Russell, stating that Anthony could return safely to work under the restrictions Russell had outlined in October 2019—no night driving, adequate illumination, and additional time to complete certain tasks—but FCA took no action in response. (*Id.*) The complaint does not describe Anthony's or FCA's activities in the spring or early summer of 2021, but Anthony alleges that in August 2021, FCA resumed "pressuring" Anthony to go on long-term disability leave and claim Social Security disability insurance, with FCA asserting that Anthony remained unable to work due to his visual impairment. (*Id.*) Anthony did not do so and instead, on October 21, 2021, again requested a reasonable accommodation for his vision impairment. (*Id.* at 12.)

On February 10, 2022, Anthony participated in a phone conference with Union representative Cavallaro and a representative from FCA named Okoya Washington. (*Id.*) Anthony alleges that Washington adopted a "confrontational tone" during this meeting, and that

---

[5] It is not clear when these EEOC charges were first filed. At one point in his complaint, Anthony seems to allege that he filed charges against both Defendants on May 27, 2020. (Compl. at 2.) But in an Amended Charge of Discrimination filed with the EEOC on September 7, 2023 and appended to his complaint, Anthony stated that he had initially filed the charges on June 5, 2020. (*See id.* at 11.) Finally, Anthony has also attached to his complaint a copy of an EEOC Charge of Discrimination filed against the Union dated to December 1, 2020. (*See id.* at 20.) The December 2020 form outlines his claims of disability discrimination and makes no mention of any previously-filed charge from May or June 2020.

when Anthony asked that Washington put questions in writing and allow Anthony time to respond, Washington refused. (*Id.*) Instead, she proceeded to quiz Anthony about fine details of jobs that Anthony had not performed since being laid off in October 2019. (*Id.*) Anthony was not given an opportunity to consult with a lawyer about his answers to these questions and received no assistance from Cavallaro during the meeting. (*Id.*) Meanwhile, Washington repeatedly misrepresented Anthony's answers when rephrasing them in her own language. (*Id.*)

On March 22, 2022, Anthony attended another phone conference with Washington and Cavallaro. (*Id.*) In this conference, Anthony was informed (he does not say by whom) that he would be granted no accommodations, and that FCA would offer him no alternative employment. (*Id.*) Again, Anthony says, Cavallaro offered him "no assistance" during this meeting. (*Id.*) Neither Washington nor Cavallaro were willing to commit to writing their reasons for denying his requested accommodations. (*Id.*) Then on July 13 or 14, 2022, Washington, the FCA representative, advised Anthony in writing that his "ADA requests would need to be thrown out" before he could return to work. (*Id.*)

At some point later in 2022, the Union "obtained a resolution" to Anthony's grievance that required Anthony to submit to an independent medical examination ("IME"). (*Id.* at 13.) But instead of sending Anthony to a doctor near his home in Rockford, Illinois, FCA and the Union required him to see a doctor in Des Plaines, Illinois, more than 70 miles away. (*Id.*) Anthony submitted to the IME in December 2022, only to learn about six weeks later that the IME had been rejected by FCA and the Union, who now took the position that the doctor they themselves had insisted on was not qualified to render an opinion on Anthony's limitations. (*Id.*)

Finally, on March 21, 2023, Anthony was awarded reinstatement at FCA pursuant to a settlement of the grievance the Union had filed on his behalf. (*Id.*) But Anthony was not awarded back pay as part of this settlement and was not provided a reason for this in response to his repeated questions of Union officers. (*Id.*) Anthony appealed the settlement through a process internal to the Union, but the appeal was denied, again without explanation. (*Id.*)

On September 7, 2023, Anthony filed an amended charge of discrimination with the EEOC regarding his case against FCA and the Union. (*See id.* at 8–13.) On February 21, 2024, he received a Notice of Right to Sue from the EEOC with regards to the Union (*see id.* at 3, 14–17); Anthony received a Notice of Right to Sue with respect to Stellantis on April 26, 2024. (*See id.* at 3, 33–37.) Anthony filed this lawsuit on May 2, 2024, alleging that both FCA and the Union had violated his rights under the ADA and that the Union did not provide him with fair representation. (*See id.* at 3–4.)

Though summons issued as to both Defendants, the record in this case does not show that either FCA or the Union were ever served with process. The Union nonetheless entered an appearance on August 5, 2024, and filed the instant motion on the same date. ([6], [7].)

## LEGAL STANDARD

The Union has moved to dismiss Anthony's claims on two grounds: that the ADA claim is time-barred under that statute, and that Anthony has failed to state a claim for relief under either the ADA or pursuant to the Union's duty of fair representation.

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint "must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Pro se complaints like Anthony's are construed liberally. *Johnson v. Prentice*, 29 F.4th 895, 903 (7th Cir. 2022). Nonetheless, even pro se pleadings must go beyond mere labels and conclusions and "raise a right to relief above the speculative level" to survive a motion to dismiss. *Brockett v. Effingham Cnty., Ill.*, 116 F.4th 680, 685 (7th Cir. 2024) (quoting *Twombly*, 550 U.S. at 555).

"A statute of limitations provides an affirmative defense, and a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses." *Indep. Tr. Corp. v.*

*Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Dismissal under Rule 12(b)(6) is appropriate, however, when the plaintiff's complaint "sets out all of the elements of an affirmative defense." *Id.*

**DISCUSSION**

Anthony claims the Union violated his rights under the ADA by approving or signing off on his October 2019 layoff, failing to file a grievance addressing Anthony's layoff for almost a year, and settling Anthony's grievance without securing any back pay on Anthony's behalf. (Compl. at 5–7.) Anthony contends that the Union breached its duty of fair representation to him for essentially the same reasons. (*Id.*) The Union has moved to dismiss both claims, and for the reasons stated below, the motion is granted.

**I. ADA Claim**

The ADA makes it unlawful for labor organizations to discriminate against disabled individuals because of their disabilities. *Ogborn v. United Food & Com. Workers Union, Loc. No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) (citing 42 U.S.C. §§ 12112(a), b(5)(A)); *accord Aku v. Chicago Bd. of Educ.*, 290 F. Supp. 3d 852, 865 (N.D. Ill. 2017). To establish an ADA discrimination claim, Anthony must show that "his disability was the 'but for' reason for" an adverse action by the Union. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (quoting *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)). In recent years, the Seventh Circuit has moved away from using "multifactored tests" to determine but-for causation in employment discrimination cases, and instead directed courts to "decide, when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [adverse action].'" *Id.* (quoting *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Anthony argues that the Union violated the ADA by "failing to ensure" that FCA complied with the law, and either "actively colluding" in or "tacit[ly] support[ing]" FCA's alleged discriminatory exclusion of Anthony from work. (Anthony's Resp. to Mot. ["Opp."] [16] at 1.)

Anthony contends these violations are evidenced by the Union's refusal to adequately challenge his removal or advocate for reasonable accommodations on his behalf. (*Id.*) The Union argues, first, that Anthony's ADA claim is time-barred "because it arose more than 300 days prior to his filing the first EEOC Charge against the Union on December 1, 2020." (Mem. [8] at 4.) Second, the Union asserts that Anthony's claim must fail because he "has conspicuously failed to allege that the Union treated him any less favorably than it did any other non-disabled bargaining unit employees." (*Id.* at 6.)

The court begins with the timeliness argument. "Because the ADA's enforcement provision expressly incorporates § 2000e–5 of Title VII," claims for discrimination under the ADA "must be filed within 300 days after the alleged unlawful employment practice occurred." *Stepney v. Naperville Sch. Dist.*, 392 F.3d 236, 239 (7th Cir. 2004); *see also Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 744 (7th Cir. 2021) (citing 42 U.S.C. § 2000e-5(e)(1)) (In Illinois, a plaintiff who asserts Title VII claims "has 300 days from the alleged discriminatory or retaliatory act to file a timely charge of discrimination with the EEOC.")

Anthony has alleged that he first filed EEOC charges against the Union either on May 27, 2020, or June 5, 2020, less than 300 days after he was laid off by FCA on October 8, 2019. The fact that he also apparently filed charges on December 1, 2020 does not conclusively disprove the former allegation, although it does seem odd that Anthony (a) would file charges regarding the same treatment twice in one year and not mention the first filing in the second, and (b) that Anthony would attach to his complaint the second set of charges, as well as amended charges filed years later in September 2023, but decline to attach a copy of the first set of charges (whether they were filed in May or June 2020).

On to the substantive claim. Anthony has not alleged that similarly situated, non-disabled employees received better treatment from the Union than he did. Such an allegation would likely be sufficient to satisfy the applicable but-for standard. *See Monroe*, 871 F.3d at 504 (7th Cir. 2017). But even without such an allegation, Anthony might state a claim by plausibly alleging that

his disability caused the Union to fight his layoff or pursue his grievance less effectively than it would have otherwise. He has not done so. At best, Anthony appears to impute the alleged discriminatory motives of FCA to the Union, reasoning that because the Union moved more slowly than he would have liked and did not achieve his ideal outcome in settling the grievance, the Union must either have colluded in or tacitly approved of FCA's bad acts. This sort of conclusory statement is insufficient to support Anthony's claim even at the pleading stage.

Anthony's ADA claim against the Union must be dismissed. If Anthony chooses to re-file this claim, the court directs him to provide a copy of his timely-filed EEOC charges or otherwise ensure that there is no ambiguity regarding the date when he first filed charges against the Union.

## II. Fair Representation Claim

"When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty . . . to represent all members fairly." [6] *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013) (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998)). A union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)). A plaintiff may succeed on a duty of fair representation claim "by establishing any of

[6] Fair representation claims against unions are often brought under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, as one part of a "hybrid action," where the employee alleges that the "employer violated a collective bargaining agreement and that the union breached its duty of fair representation in the course of failing to hold the employer to its promise." *Copeland v. Penske Logistics LLC*, 675 F.3d 1040, 1042 (7th Cir. 2012). In the § 301 context, the two parts of the claim are "inextricably interdependent," and plaintiffs must establish both to prevail. *Nemsky v. ConocoPhillips Co.*, 574 F.3d 859, 864 (7th Cir. 2009) (internal citations omitted). But a union's duty of fair representation to its members does not spring from the LMRA, and fair representation claims need not be brought under § 301. As the Seventh Circuit and Supreme Court have recognized, "independent federal jurisdiction exists over fair representation claims" under 28 U.S.C. § 1337(a), "because the duty is implied from the grant of exclusive representation status, and the claims therefore 'arise under' the [National Labor Relations Act]." *Daniels v. Pipefitters' Ass'n Loc. Union No. 597*, 945 F.2d 906, 920 (7th Cir. 1991)(quoting *Breininger v. Sheet Metal Workers Int'l Ass'n Loc. Union No. 6*, 493 U.S. 67, 83 (1989)).

these three bases." *Bishop v. Air Line Pilots Ass'n Int'l*, 5 F.4th 684, 693 (7th Cir. 2021) (*Bishop II*) (citing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)).

Here, Anthony argues that the Union's conduct was arbitrary, discriminatory, in bad faith, or all three. He contends that the Union prioritized FCA's interests over his in its "repeated refusals to adequately challenge" his removal or "advocate for accommodations." (Opp. at 1.) In his view, the Union's one-year delay in filing his grievance is "indicative of the Union's unwillingness to represent his interests," and the Union's decision to settle his grievance without securing back pay or other restitution "further illustrates" the Union's disregard for his rights, because the decision "effectively legitimized the company's discriminatory actions and ignored the financial and professional harm" he suffered. (*Id.*)

**A. Arbitrariness**

"A union's actions are arbitrary 'only if . . . the union's behavior is so far outside a wide range of reasonableness' as to be irrational." *Yeftich*, 722 F.3d at 917 (internal citations omitted). This is an objective inquiry. *Id.* at 916. The arbitrary prong is "very deferential" because Congress "did not intend courts to interfere with the decisions of the employee's chosen bargaining representative." *Id.* at 917 (quoting *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir.1992)).

While "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," it "has discretion to act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer." *Yeftich*, 722 F.3d at 917 (quoting *Vaca*, 386 U.S. at 186–87 and *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003)). This sets a high bar for a union member who alleges arbitrary conduct on the part of his representative. "The union must provide some minimal investigation of employee grievances, but the thoroughness of this investigation depends on the particular case, and only an egregious disregard for union members' rights constitutes a breach of the union's duty." *Yeftich*, 722 F.3d at 917 (quoting *Garcia v. Zenith Elecs. Corp.*, 58 F.3d

1171, 1176 (7th Cir.1995)). Otherwise, courts "should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Garcia*, 58 F.3d at 1176 (quoting *Ooley*, 961 F.2d at 1302).

Anthony's allegations do little more than suggest that the Union could have handled his employment dispute with FCA more effectively; his pleadings do not clear the high bar of the arbitrariness prong. Even according to Anthony's version of the story, the Union did more than conduct a minimal investigation of his grievance—it pursued the grievance and successfully got Anthony reinstated after he was laid off (albeit several years later). Anthony was understandably disappointed that back pay was not included in his grievance settlement, but the fact that the Union did not secure it or that Union officials allegedly refused to explain the outcome does not show that the settlement was objectively egregious or irrational.

**B. Discriminatory or Bad Faith Actions**

"Whether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Bishop II*, 5 F.4th at 694 (quoting *Neal*, 349 F.3d at 369). In order to breach the duty of fair representation, discriminatory conduct must be "intentional, severe, and unrelated to legitimate union objectives." *Bishop II*, 5 F.4th at 694 (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). "[B]y way of example, a union may not make distinctions on the basis of race. . . or sex." *Bishop II*, 5 F.4th at 694 (internal citations omitted). More generally, a union's motive is improper if it is "obviously irrelevant and invidious." *Id.* (quoting *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 203 (1944)).

In a "bad faith" case, an improper motive could include punishing political opponents, like those who "supported a losing candidate for union office." *Bishop II*, 5 F.4th at 695 (internal citations omitted). Further, "deceptive actions or fraud can be relevant to whether a union acted in bad faith." *Id.* (quoting *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 398 (7th Cir. 2018) (*Bishop I*)). Even at the pleading stage, however, "assertions of the state of mind required" for

bad faith "must be supported with subsidiary facts." *Yeftich*, 722 F.3d at 916 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009)).

Anthony has made no specific factual allegations that the Union acted out of improper motives either in delaying the filing of his grievance or in its failure to secure a back pay award. As described above, Anthony has attempted to impute FCA's alleged bad motives to the Union, but whatever FCA's motives may have been, without more they are not sufficient to establish liability against the Union. *See Wickstrom v. Air Line Pilots Ass'n, Int'l*, No. 23 C 2631, 2024 WL 5089199, at *4–5 (N.D. Ill. Dec. 12, 2024) (quoting *Neal*, 349 F.3d at 369) (Even at the pleading stage, a "mere suggestion" of collusive conduct between a union and employer will not support a claim of bad faith.) Absent a clearer allegation—for example, by reference to a similarly situated employee who received more favorable treatment—that the Union itself singled Anthony out for unfavorable treatment based either on his disability or some other impermissible consideration, Anthony's fair representation claim must be dismissed.

**CONCLUSION**

The Union's motion to dismiss Anthony's complaint [7] is granted. But "[u]nless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, [district courts] should grant leave to amend after granting a motion to dismiss." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015) (quoting *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004)). Anthony has leave to submit an amended complaint on or before April 8, 2025. Before doing so, he is encouraged to contact the court's pro se litigant help desk. *See William J. Hibbler Memorial Pro Se Assistance Program Help Desk*, U.S. DIST. CT. N.D. ILL., https://www.ilnd.uscourts.gov/_assets/_news/Hibbler%20Help%20Desk%20Flyer%202018.pdf (last visited Mar. 6, 2025). He is also encouraged to discuss with Union counsel the possibility of settlement.

ENTER:

Dated: March 7, 2025

REBECCA R. PALLMEYER
United States District Judge